**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MATTHEW D'ANNUNZIO,** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| **v.** | : | **NO. 23-4533** |
| **S.G. PRESTON COMPANY,** | : | |
| Defendant. | : | |

**Perez, J.** **September 16, 2026**

**MEMORANDUM**

For years, Plaintiff Matthew D'Annunzio provided legal services to his client S.G. Preston Company ("SGP") without being paid. He devoted his own time to SGP's matters, assigned other attorneys at his law firm to assist, and advocated for the representation to continue as the unpaid bills mounted. By the end, his law firm was owed more than a million dollars, and D'Annunzio himself had suffered substantial losses under the firm's compensation system. He nevertheless continued representing SGP, believing that it would obtain financing, pay the firm, and address his personal losses. Unfortunately, D'Annunzio forgot a basic tenet of contract formation: a contract requires a manifestation of intent to be bound—*i.e.*, an offer and acceptance. An invitation to negotiate, or a mere expression of willingness to make an offer, will not suffice. D'Annunzio's belief that SGP would make him whole is not the same as an enforceable promise. The single email on which he relies expressed a willingness to discuss compensating him; it did not manifest an intent to be bound on sufficiently definite terms. For these reasons, and the reasons put forth in more detail below, the Court grants SGP's motion for summary judgment on D'Annunzio's breach of contract and promissory estoppel claims. There remains a dispute of material fact as to whether

D'Annunzio personally conferred a benefit on SGP that would be unjust for it to retain without compensation. D'Annunzio's unjust enrichment claim, therefore, survives.

Additionally, the Court finds that neither issue preclusion nor judicial estoppel prevent SGP from asserting a defense that any payment due to Offit was contingent upon it receiving financing. For that reason, and because a material dispute remains as to whether a contingency agreement was formed, the Court denies D'Annunzio's motion for partial summary judgment and motion to strike.

## I. Background

Plaintiff Matthew D'Annunzio is a shareholder at Offit Kurman ("Offit"). Offit's compensation plan provides that shareholders only receive compensation on fees billed and collected on matters of their origination. When payments are late, the originating shareholder's compensation is decreased. D'Annunzio refers to this as a "step down" system, meaning the later a bill is paid, the less compensation the shareholder receives until the payment is so late that the shareholder is entitled to no compensation at all. When a client does not pay their bills at all, the shareholder receives no compensation and he must reimburse Offit 50% of the compensation it paid to other attorneys who rendered services to the nonpaying client.

When D'Annunzio moved his practice to Offit in September 2016, he brought his client, Defendant S.G. Preston Company ("SGP") and its CEO and founder, R. Delbert Letang, with him. *See* Statement of Undisputed Facts Supp. SGP's Mot. Summ. J. ("SGP SOF"), ECF No. 106 ¶ 1; Statement of Undisputed Facts Supp. D'Annunzio's Mot. Partial Summ. J. ("D'Annunzio SOF"), ECF No. 107-3 ¶ 4. SGP stopped paying Offit for its legal services after February 17, 2017. Nevertheless, Offit continued providing legal services to SGP for two years. During that time, SGP represented to D'Annunzio that it was on the verge of obtaining financing from various sources, from which it would pay its legal bills. When Offit's leadership raised concerns with D'Annunzio

about SGP's failure to pay its bills, D'Annunzio advocated for his client, explaining that Offit would receive payment when SGP received financing and that financing was close to being won.

By December 2018, SGP's outstanding account receivable to Offit was approximately $800,000. ECF No. 106 ¶ 3. D'Annunzio was under significant pressure from Offit's leadership to collect those fees. *See* SGP Ex. B, D'Annunzio Dep. Tr., Feb. 6, 2026, ECF No. 106-2 at 106; D'Annunzio Ex. 24, SGP Dep. Tr., Mar. 23, 2022, ECF No. 106-5 at 655. On December 17, 2018, D'Annunzio and Letang met at Offit's offices. D'Annunzio Ex. 26, SGP Dep. Tr., Feb. 4, 2026, ECF No. 106-5 at 798–99. During that meeting, D'Annunzio explained Offit's compensation system and the losses he was suffering due to SGP's nonpayment of its legal fees. *See* D'Annunzio Dep. Tr., Feb. 6, 2026, ECF No. 106-5 at 714–15. On December 18, 2018, Letang sent the following email to D'Annunzio:

> Matt,
>
> Good morning. I didn't sleep well after our discussion yesterday. I will outline our options for cash flow as discussed but am also willing to offer to absorb the losses that you may suffer personally from our invoices.
>
> I am preparing for my meeting with Danielle but can discuss further in our update call later today.

SGP Ex. C, ECF No. 106-2 at 323. D'Annunzio responded later that day: "Good luck with the meeting. We will find a solution. I appreciate you are trying your best." *Id.* Neither party contends that they discussed this email in the update call later that day or that the update call even occurred.

On December 20, 2018, D'Annunzio emailed Letang, reminding him to send a short "business plan" to bring SGP's accounts receivable current. SGP Ex. D, ECF No. 106-2 at 326. He reiterated that he was "under intense year end scrutiny" and wrote, "If Fed Ex signs in 2 weeks as Joel committed, that solves it—right? (although it does not solve my problem with the further penalties to my comp as 2016 and 2017 receivables age past another calendar year)." *Id.* The

parties did not submit a response from Letang. Nor did the parties communicate further regarding Letang's email about absorbing D'Annunzio's losses. D'Annunzio Dep. Tr., Feb. 6, 2026, ECF No. 106-5 at 732.

Following those email exchanges, D'Annunzio and Offit continued providing legal services to SGP. According to Offit's Chairman Theodore Offit, it continued representing SGP based on D'Annunzio's assurances that SGP "was going to be a successful company, had the ability to pay its invoices." SGP SOF ¶ 23, ECF No. 106; SGP Ex. E, Offit Dep. Tr., Feb. 19, 2026, ECF No. 106-2 at 391–92. However, by October 2019, SGP still had not provided payments on Offit's invoices, and Offit sued SGP in the Philadelphia Court of Common Pleas to recover the unpaid fees (the "Offit Action"). *See* D'Annunzio SOF ¶ 1; D'Annunzio Ex. 1, Offit Action Compl., ECF No. 107-5 at 2.

**A. The Contingency Defense**

SGP contends that in March of 2017, Letang met with D'Annunzio at D'Annunzio's office, and the two agreed that SGP would pay Offit if and when it obtained financing. *See* D'Annunzio Ex. 26, Letang Dep. Tr., Feb. 4, 2026, ECF No. 107-21 at 10 ("This was a contingency arrangement. So you knew from the outset that there was going to be no compensation to anyone – Offit or anyone – until we received financing."); *id.* at 13 (referring to email about bringing the accounts current and stating that "financing is how we brought the AR current based upon our contingency agreement that you are paid out of first dollars from any financings that we would raise"). The meeting was "undocumented" and "unwitnessed" and involved only D'Annunzio and Letang. *Id.*

D'Annunzio does not dispute that the March 2017 meeting occurred, but he does dispute that any contingency agreement was reached. *See* D'Annunzio Ex. 25, D'Annunzio Dep. Tr., Feb.

6, 2026, ECF No. 106-5 at 738. In any event, D'Annunzio continued to encourage the representation with Offit's management, report on SGP's financing opportunities, and reiterate that Offit would "get paid at financing." *See* SGP Ex. 11, Offit Internal Emails Feb. 2019, ECF No. 106-5 at 388–93.

**B. The Offit Action**

When SGP answered the complaint in the Offit Action, it denied that "SGP requested legal services payable at Offit Kurman's usual rates for the representation along with costs incurred on its behalf which were billed pursuant to monthly invoices issued to be due within 30 days." ECF No. 75-2 at 40, 56; ECF No. 107-5 at 15, 41. It explained that SGP "will pay a fair price for services provided after an opportunity to review and audit all relevant invoices and supporting documentation that describe work performed by [Offit.]" ECF No. 75-2 at 56–57; ECF No. 107-5 at 41–42. SGP also denied that it "should be estopped from denying its obligations" to Offit but acknowledged that it incurred debt to Offit, though it disputed the amount. ECF No. 75-2 at 45, 59; ECF No. 107-5 at 20, 44. Finally, SGP denied that Offit "had a reasonable expectation of receiving payment for the services and costs incurred . . . consistent with [SGP's] representations and/or promises regarding payment." ECF No. 75-2 at 46, 59; ECF No. 107-5 at 21, 44. It elaborated that SGP believed some of the charges were excessive and stated it "wants to pay a fair price to [Offit] for services that are not the result of overbilling." ECF No. 75-2 at 59; ECF No. 107-5 at 44.

During discovery, Offit served interrogatories on SGP, including Interrogatory Number 15, which asked SGP to "[i]dentify all amounts you admit are owed by SGP to Offit Kurman for invoices for services rendered and costs advanced referencing the dates of the invoices." D'Annunzio Ex. 7, Offit Action Interrogatories, ECF No. 107-5 at 137. SGP initially objected and

responded that it could not fully answer without copies of detailed invoices. *Id.* at 139. Following a motion to compel, SGP supplemented its response, asserting that it owed $385,227. D'Annunzio Ex. 9, SGP Supp. Resp. Interrogatory No. 15, ECF No. 107-5 at 146. Offit moved for summary judgment, and SGP opposed without raising any contingency defense. On March 28, 2022, the state court entered partial summary judgment against SGP in the amount of $385,227, based on SGP's supplemental response to Interrogatory Number 15. D'Annunzio Ex. 14, Partial Summ. J. ("PSJ") Order, ECF No. 107-14 at 2. The state court then denied two motions to reconsider the PSJ Order. D'Annunzio Ex. 18, Apr. 29, 2024 Order, ECF No. 107-15 at 457 (denying reconsideration and denying leave to amend new matter to add contingency defense because SGP waited four years into the litigation to raise the defense and because it sought to improperly relitigate the amount owed as determined by the PSJ order in violation of law of the case and coordinate jurisdiction doctrines); July 24, 2024 Order, ECF No. 107-15 at 465 (same).

SGP also filed a separate breach of contract action against Offit, asserting that Offit breached an oral agreement that it would only recover legal fees from SGP if SGP acquired funding. D'Annunzio Ex. 23, Dec. 6, 2024 Order, ECF No. 107-15 at 482–84 (attached as Exhibit 23 to D'Annunzio's Motion for PSJ). Applying the law of the case doctrine, the court dismissed the amended complaint with prejudice because that defense was already rejected in the related Offit Action and because SGP was actually bringing a *Dragonetti* claim, the elements of which it had not pled. *Id.*

Finally, on August 10, 2026, following a bench trial where SGP failed to appear, the state court entered judgment in favor of Offit in the amount of $1,795,538, comprised of $710,560.02 unpaid legal fees, interest at the rate of 1% per month ($1,084,977.81), and legal fees and costs

related to the collection of SGP's debt, in an amount to be determined at a hearing on September 9, 2026. *Id.* at 67–68. These amounts were in addition to the partial summary judgment award. *Id.*

**C. Federal Court Procedural History**

D'Annunzio initiated this action against SGP on October 30, 2023, bringing claims for breach of contract, promissory estoppel, and unjust enrichment. ECF No. 1-5. D'Annunzio asserts he personally suffered damages from SGP's failure to pay its legal fees, including (1) loss of compensation in the amount of $446,270.50; and (2) payment to Offit for 50% of the compensation to other billers in the amount of $49,595.96. *Id.* ¶¶ 77–78. SGP removed the case to this Court on November 17, 2023. ECF No. 1. On December 29, 2023, SGP answered the complaint and raised a counterclaim for intentional interference with contractual relations, which alleged that D'Annunzio knew SGP would not pay him or Offit unless it obtained financing. ECF No. 12 ¶ 123.

Following motions practice related to remand, the parties agreed D'Annunzio would respond to SGP's counterclaims by October 28, 2024. ECF No. 27. After a meet and confer, SGP voluntarily dismissed its counterclaim on October 16, 2024. ECF No. 28. On February 7, 2025, the Court noticed a Rule 16 conference for April 9, 2025. ECF No. 31. On February 19, 2025, SGP's attorney moved to withdraw. ECF No. 32. On March 10, 2025, the Court granted the motion and stayed the case for 45 days to allow SGP to obtain new counsel. ECF No. 37. On May 5, 2025, the Court lifted the stay and rescheduled the Rule 16 conference. ECF Nos. 43, 44.

On August 4, 2025, D'Annunzio moved to bifurcate the liability and a portion of the damages claims, pending resolution of the Offit Action. ECF No. 48. The Court granted the motion in part on December 19, 2025. ECF No. 64. On January 5, 2026, after the parties notified the Court of a discovery dispute, the Court held a virtual hearing where it allowed SGP to conduct discovery

related to its contingency defense. *See* SGP Ex. 6, Tr. Status Conf. Hr'g, Jan. 5, 2026, ECF No. 107-5 at 127–28, 131–32.

On February 25, 2026, D'Annunzio moved to strike any of SGP's defenses predicated on a contention that SGP entered an agreement with Offit that its obligations to pay Offit's fees were contingent on its obtaining financing. ECF No. 75 (listing Answer ¶¶ 28, 35–37, 39–45, 52, 54–57, 59–61, 64, 70–73, 80–82, 91–94, and 99–101, and the First, Second, Third, Fourth and Sixth Affirmative Defenses). On May 20, 2026, D'Annunzio moved for partial summary judgment on the same grounds. ECF No. 107. Also on May 20, 2026, SGP moved for summary judgment on all of D'Annunzio's claims. ECF No. 105. Following the entry of judgment in the Offit Action, D'Annunzio also moved to supplement the record to address the state court judgment's effect on the motions pending before this Court. ECF No. 118. The motions have been fully briefed and are ripe for review.[1]

## II. Motion to Strike

As an initial matter, the motion to strike is untimely. Rule 12(f) of the Federal Rules of Civil Procedure allows the court to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike must be filed no more than 21 days after the pleading is served. Fed. R. Civ. P. 12(f)(2). Motions to strike are disfavored and generally will not be granted unless the moving party is prejudiced by the presence of the allegations. *Handy v. Del. River Surgical Suites, LLC*, No. 19-cv-1028, 2023 WL 11884816, at *1 (E.D. Pa. Jan. 23, 2023), *R. & R. adopted*, 2023 WL 7031520 (E.D. Pa. Mar. 24, 2023). "An affirmative defense need not be plausible to survive; it must merely provide fair notice of the issue involved." *Tyco Fire Prods. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 900 (E.D. Pa. 2011).

---

[1] Also pending is a motion to compel from each side. ECF Nos. 77 (SGP) & 79 (D'Annunzio). The Court will resolve those motions separately.

D'Annunzio waited over two years from being served SGP's answer with its affirmative defenses to move to strike the contingency defense and related allegations. He contends that motions practice relating to the contingency defense was not necessary until after SGP pressed the issue in the January 2026 discovery dispute related to whether the contingency defense fell within the liability or damages phase of the trial. Even accepting that argument, D'Annunzio's motion was not timely. D'Annunzio had no shortage of opportunities to file his motion to strike, including after SGP dismissed the counterclaim, after the first stay was lifted, after the court's bifurcation order, or even after the Court allowed SGP to pursue discovery relating to the contingency defense. At least by the time the Court ruled on the discovery dispute on January 5, 2026, it was clear SGP intended to pursue the contingency defense. *See* SGP Ex. 6, Tr. Status Conf. Hr'g, Jan. 5, 2026, ECF No. 107-5 at 127–28, 131–32. Nonetheless, D'Annunzio waited 51 days to file his motion to strike. *See* ECF No. 75. For that reason, D'Annunzio's motion to strike under Rule 12(f) is denied.

D'Annunzio also invoked Federal Rule of Civil Procedure 12(c) in his motion. Rule 12(c), which allows for judgment on the pleadings, does not carry an explicit deadline. Regardless, the standard under Rule 12(c) as it would apply here is the same as the Court would apply at summary judgment.[2] D'Annunzio raises the same arguments in his motion for partial summary judgment, so the Court will rule on those issues in connection with D'Annunzio's partial summary judgment motion in Part V below.

## III. Summary Judgment Standard

Summary judgment may be granted where there is no genuine dispute of material fact and the moving party shows he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex*

[2] Rule 12(c) of the Federal Rules of Civil Procedure allows the Court, upon motion by a party, to order judgment on the pleadings. Generally, Rule 12(c) motions asserting a party has not stated a claim are decided under the same standard as a Rule 12(b)(6) motion. However, if "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(c)] motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* In resolving a summary judgment motion, "the court must neither resolve factual disputes nor make judgments of credibility; instead, all inferences should be drawn in the light most favorable to the non-moving party." *Peloro v. United States*, 488 F.3d 163, 173 (3d Cir. 2007) (cleaned up).

## IV. SGP's Motion for Summary Judgment

### A. Breach of Contract (Counts I and II)

Under Pennsylvania law, "the paramount goal of contractual interpretation is to ascertain and give effect to the intent of the parties." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 667 (3d Cir. 1998) (citation omitted). A breach of contract claim requires the existence of a contract, meaning: (1) manifestation of an intent to be bound; (2) sufficiently definite terms; and (3) consideration. *Id.* at 666.

Here, D'Annunzio raises two breach of contract claims based on SGP's refusal to reimburse him for the losses he personally suffered because of SGP's nonpayment of fees to Offit. On December 17, 2018, the parties met in D'Annunzio's office and discussed "A/R, cash flow, scrutiny, compensation losses, and working-attorney compensation." ECF No. 108 at 15. Letang then emailed D'Annunzio on December 18 stating that he lost sleep over their conversation and that he was "willing to offer to absorb the losses that you may suffer personally from our invoices being in arrears." ECF No. 106-2 at 323. D'Annunzio contends that statement constituted an offer, and his response, "We will find a solution. I appreciate you are trying your best," *id.*, and continued legal representation of SGP constituted an acceptance and consideration.

### 1. Manifestation of Intent to Be Bound

The first element—manifestation of an intent to be bound—requires "a 'meeting of the minds,' whereby both parties mutually assent to the same thing, as evidenced by an offer and its acceptance." *Refuse Mgmt. Sys., Inc. v. Consol. Recycling & Transfer Sys. Inc.*, 671 A.2d 1140, 1146 (Pa. Super. Ct. 1996) (citation omitted). It is well established that "[e]vidence of preliminary negotiations, or an agreement to enter into a binding contract in the future, does not alone constitute a contract." *Ruggiero v. Nocenti*, 556 F. Supp. 3d 512, 522 (E.D. Pa. 2021). Nor does an expression of willingness to make an offer. *Cowen v. Krasas*, 264 A.2d 628, 630–31 (Pa. 1970) (quoting Williston on Contracts (3d ed.) § 26) ("Since an offer must be a promise, a mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer."); Restatement (Second) of Contracts § 26 ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.")

An offer must be intentional and sufficiently definite in its own terms. *Lackner v. Glosser*, 892 A.2d 21, 31 (Pa. Super. Ct. 2006). "Whether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances." *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alts., Inc.*, 764 A.2d 587, 593 (Pa. Super. Ct. 2000) (citation omitted). "[T]he object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009).

D'Annunzio characterizes Letang's statement that he was "willing to offer to absorb the losses that [D'Annunzio] may suffer personally from [SGP's] invoices being in arrears" as an offer. This statement, however, is merely an expression of willingness to make an offer, followed by an invitation to discuss the details on a call later that day. *See* ECF No. 106-2 at 323 ("I am preparing for my meeting with Danielle but can discuss further in our update call later today."); *see also* Restatement (Second) of Contracts § 26. In other words, Letang invited D'Annunzio to negotiate. He did not make an intentionally, sufficiently definite offer.

D'Annunzio invokes the dictionary definition of "willing" in support of his position that the statement was an offer, not merely an expression of willingness to make an offer. ECF No. 108 at 3 n.5. However, the definition D'Annunzio provides supports Letang's position, not D'Annunzio's. D'Annunzio states that the Oxford Languages Dictionary defines "willing" to be "[r]eady, eager or prepared to do something." *Id.* He then argues, "Mr. Letang's use of the word 'willing' establishes his and SGP's readiness to make an offer to D'Annunzio without precondition or qualification. He stated he was ready to make an offer and then did so." *Id.* While the Court agrees with D'Annunzio's first conclusion, that Letang stated he was ready to make an offer, it cannot agree with the second, that he then did so. The second conclusion reads into the email an additional statement that is not there. Letang stated he was "**willing to offer** to absorb the losses." ECF No. 106-2 at 323. He then stated he was available to discuss that potential offer further later that day. His email does not clearly and unambiguously make a present offer "to absorb the losses" in the way D'Annunzio describes. *See* ECF No. 108 at 3 (describing "willing to offer" as being "a present offer 'to absorb the losses . . .' without precondition").

D'Annunzio's response to Letang also indicates that he believed the two would consider working toward a solution but no agreement on the terms had been reached. He did not indicate

he agreed to any offer contained in Letang's email or that it was an acceptable resolution to his compensation problems. To the contrary, D'Annunzio stated, "We will find a solution. I appreciate you are trying your best." ECF No. 106-2 at 323. That statement does not indicate an acceptance of the supposed terms of the offer he now believes Letang's email contained. It instead indicates that D'Annunzio anticipated engaging in further conversations and negotiations to "find a solution" as to his personal losses. His email two days later supports that finding. There, D'Annunzio again indicated no solution had been found or agreed upon as to his personal losses. ECF No. 106-2 at 326 (asking if Fed Ex's funding "solves it" and noting "it does not solve my problem with the further penalties to my comp"). He recalls no other communications with Letang regarding SGP's "promise" to absorb his losses. ECF No. 106-5 at 732. None of these facts are in dispute, and the undisputed facts show no meeting of the minds. Summary judgment must, therefore, be granted.

**2. Sufficiently Definite Terms**

The breach of contract claims fail for the additional reason that Letang's email lacks sufficiently definite terms. A contract's terms must "provide a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33; *see also Reed v. Pittsburgh Bd. of Public Educ.*, 862 A.2d 131, 135 (Pa. Commw. Ct. 2004). In other words, "[a]n agreement is definite if it indicates the parties intended to make a contract and there is an appropriate basis upon which a court can fashion a remedy." *Biddle v. Johnsonbaugh*, 664 A.2d 159, 163 (Pa. Super. Ct. 1995); *see also ATACS Corp.*, 155 F.3d at 668 (explaining that even if parties manifested mutual assent, absent sufficiently definite terms, "there is no basis for the court to fashion a suitable remedy"). When "there is no agreement or even a discussion as to *any* of the essential terms of an alleged bargain, such as time or manner of performance, or price or

consideration, the 'agreement' is too indefinite for a party to *reasonably* believe that it could be enforceable in an action at law." *Lackner*, 892 A.2d at 31.

Here, Letang's December 18, 2018 email does not contain sufficiently definite terms that the Court can enforce. Even if the Court accepts that the losses that D'Annunzio may suffer personally refers to D'Annunzio's losses under Offit's compensation system, the Court has no way to know whether losses he "may suffer" includes past losses, existing losses, future losses, or any combination of those amounts. Additionally, the email is silent as to D'Annunzio's obligations under the purported agreement. Even assuming the consideration was for D'Annunzio to continue representing SGP, the email does not establish the parameters of that representation—whether it must continue for existing matters only, whether D'Annunzio must take on new matters in perpetuity, or if he could end the representation at any time. Nor do the email's terms establish any timeline for payment—whether it would be immediately due as D'Annunzio contends or only due when SGP obtained financing.

Accordingly, even if the Court could calculate the amount of D'Annunzio's personal loss that the email contemplates, it cannot discern the time and manner of performance for either party or the consideration. Thus, the breach of contract claim fails for the additional reason that any purported offer or agreement lacked sufficiently definite terms.

**3. Breach of Oral Contract**

D'Annunzio pleads in the alternative that Letang's December 18 email referencing "our discussion yesterday" merely confirmed an oral agreement that was reached in a meeting at Offit's Philadelphia office on December 17, 2018. ECF No. 108 at 15. According to D'Annunzio, during that conversation, D'Annunzio and Letang discussed "A/R, cash flow, scrutiny, compensation losses, and working-attorney compensation." *Id.* Notably, however, D'Annunzio does not refer to

any offer or promise Letang made during that discussion with respect to compensating D'Annunzio for his personal losses. The fact that D'Annunzio informed Letang of his personal losses under the Offit compensation system does not mean they agreed that Letang would pay for them. A party asserting a claim based on an oral contract must still show a contract was formed. *See Belnick, Inc. v. TBB Global Logistics, Inc.*, 106 F. Supp. 3d 551, 563 n.2 (M.D. Pa. 2015) ("A claim for breach of an oral contract requires proof of the same elements as breach of a written contract."). D'Annunzio has pointed to no evidence of the terms of an oral agreement, so SGP is entitled to summary judgment on D'Annunzio's breach of oral contract claim.

**B. Promissory Estoppel (Count III)**

Promissory estoppel is an equitable remedy available in the absence of an enforceable contract. *See Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000). To prevail on a promissory estoppel claim, a plaintiff must show: (1) the promisor made a promise he should have reasonably expected to induce action or forbearance; (2) the promise actually induced action or forbearance; and (3) injustice can be avoided only by enforcing the promise. *Id.* Pennsylvania law requires more than "a broad and vague implied promise." *Ankerstjerne v. Schlumberger Ltd.*, No. 03-3607, 2004 WL 1068806, at *5 (E.D. Pa. May 12, 2004) (citing *C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988)) (granting summary judgment where alleged promise did not specify "how much the plaintiff would be paid, by whom he would be paid, how payment was to be calculated, or when the plaintiff would be paid"), *aff'd* 155 F. App'x 48 (3d Cir. 2005). The promise must "be as definite as those required for enforceable contracts," such that "the full intention of the parties may be ascertained to a reasonable certainty." *Id.* "[M]ere expression[s] of intention, hope, desire, or opinion, which show[] no real commitment, cannot be expected to

induce reliance." *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 634 (3d Cir. 2013) (second alteration in original) (quoting 3 Corbin on Contracts § 8.9, at 29–30 (Rev. Ed. 1996)).

D'Annunzio relies on the same email to establish a promise that SGP should have reasonably expected to induce reliance. His argument, however, suffers from the same defect as his breach of contract claim. As noted above, a willingness to make an offer is not an enforceable promise. *See Ankerstjerne*, 2004 WL 1068806, at *5 & n.10 ("Pennsylvania courts typically apply the doctrine to enforce those promises that would otherwise have formed a contract had there been consideration."). Letang's email can reasonably read as an invitation to discuss how to make up for D'Annunzio's losses, not an outright promise to cover them all in an effort to induce D'Annunzio's reliance. D'Annunzio did not follow up on Letang's invitation to discuss. Rather, he asserted they would find a solution and then proceeded with the representation without doing so. SGP is entitled to summary judgment on the promissory estoppel claim.

**C. Unjust Enrichment (Count IV)**

Like promissory estoppel, unjust enrichment is an equitable doctrine. *Tenet Healthsystem Hahnemann, LLC v. Global Excel Mgmt., Inc.*, No. 17-536, 2017 WL 11674144, at *2 (E.D. Pa. Sept. 5, 2017) (quoting *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999)). In the context of a contract claim, or quasi-contract theory, the doctrine is "typically invoked . . . when plaintiff seeks to recover from defendant for a benefit conferred under an unconsummated or void contract." *Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999). To prevail on an unjust enrichment claim, D'Annunzio must show: "(1) he conferred a benefit on [SGP], (2) [SGP] knew of the benefit and accepted or retained it, and (3) it would be inequitable to allow [SGP] to keep the benefit without paying for it." *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016) (citing *Mitchell*, 729 A.2d at 1203–04).

"[T]he focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328 (Pa. Super. Ct. 1995).

Here, the parties' arguments diverge in defining the benefit conferred on SGP. For SGP, the benefits it received were the legal services provided by Offit, not D'Annunzio, who was acting as a principal of Offit when providing SGP with legal services. ECF No. 105 at 29. Relatedly, because Offit sued SGP for the value of the legal services, SGP contends there can be no injustice to D'Annunzio. *Id.* To D'Annunzio, the benefits he conferred on SGP went beyond providing legal services. He continued work, assigned attorneys, and advocated on SGP's behalf to prevent the termination of Offit's representation and a lawsuit to pursue legal fees. ECF No. 108 at 20. Drawing all inferences in Plaintiff's favor, the Court agrees with D'Annunzio.

Although he performed legal work for SGP in his role as principal for Offit, he argues he conferred additional benefits on SGP by postponing collection actions, advocating for continued representation, and maintaining the client relationship despite SGP's nonpayment. He did all of that to his detriment. Rather than cease the representation, D'Annunzio encouraged that it continue based on SGP's representations that it would obtain funding, pay Offit, and address his personal losses. This led to increased legal fees, which were also not paid and for which D'Annunzio personally had to reimburse the firm. SGP knew D'Annunzio's losses were increasing and knew D'Annunzio was advocating on its behalf to the firm to ensure the representation continued. SGP nevertheless accepted the continued representation and did nothing to stop D'Annunzio's performance.

There remains a dispute as to whether and to what extent SGP was unjustly enriched, meaning whether it retained a benefit despite being held liable to Offit for its unpaid legal bills. Assuming that dispute is resolved in D'Annunzio's favor, it would be inequitable for SGP to have

received such benefits while D'Annunzio absorbs all his own losses. For these reasons, SGP's motion for summary judgment on Count IV is denied.

## V. D'Annunzio's Motion for Partial Summary Judgment

D'Annunzio moves for partial summary judgment on SGP's contingency defense, seeking to preclude SGP from asserting that it had agreed with Offit that no payment would be due unless and until it received certain financing. D'Annunzio first relies on issue preclusion and judicial estoppel to argue that admissions and orders from the Offit Action should bind this Court and SGP's arguments here. He then argues that even if the Offit Action orders and admissions do not compel such a result, there is no evidence that a contingency agreement was formed. Neither argument warrants partial summary judgment.

### A. Issue Preclusion

28 U.S.C. § 1738 provides that state court judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." Federal courts look to the issuing state's law to determine the preclusive effect of a state judgment. *Sec'y U.S. Dep't Labor v. Kwasny*, 853 F.3d 87, 94 (3d Cir. 2017).

Under Pennsylvania law, issue preclusion or collateral estoppel "precludes relitigation of issues actually litigated and necessary to the outcome of the first action." *In re Stevenson*, 40 A.3d 1212, 1222 (Pa. 2012); *see also Adelphia Gateway, LLC v. Pa. Env't Hr'g Bd.*, 62 F.4th 819, 827 (3d Cir. 2023). "[A] litigant who was not a party to the initial litigation may . . . use collateral estoppel offensively in a new suit against the party who lost on the decided issue in the initial case." *In re Stevenson*, 40 A.3d at 1222 (citing *Allen v. McCurry*, 449 U.S. 90, 94–95 (1980)); *see also Peloro*, 488 F.3d at 175. The purposes of the rule include "avoiding the cost and vexation of repetitive litigation, conserving judicial resources, and, by preventing inconsistent decisions,

encouraging reliance on adjudication." *In re Coatesville Area Sch. Dist.*, 244 A.3d 373, 379 (Pa. 2021) (cleaned up).

Issue preclusion applies when four conditions are met: (1) the identical issue was decided in a prior action; (2) there was a final judgment on the merits; (3) the party opposing estoppel was a party or in privity with a party to the prior action; and (4) the party opposing estoppel had a full and fair opportunity to litigate the issue. *Adelphia Gateway*, 62 F.4th at 826.

Whether issue preclusion applies here depends on how the issue is framed. D'Annunzio believes the contingency defense should be precluded because the issue of whether SGP owed Offit $385,227 in legal fees was resolved by the PSJ Order. There, SGP did not raise any contingency defense, and when it sought to do so later through motions for reconsideration and a new complaint, it was denied. By contrast, SGP asserts that the PSJ Order did not consider or resolve whether those fees were "due" to Offit immediately or only after SGP obtained financing, in large part because, as the parties agree, SGP did not raise the contingency defense. The distinction is important because issue preclusion forecloses the relitigation of issues that were actually litigated and decided, while claim preclusion (not argued here) may reach claims that *could have been* presented in an earlier case but were not actually litigated. *Russo v. City of Phila.*, 819 F. Supp. 2d 405, 411 (E.D. Pa. 2011).

"In order for an issue to be actually litigated for purposes of the [issue preclusion] doctrine, the issue must be raised, submitted for determination, and determined." *Frazier v. Se. Pa. Transp. Auth.*, 868 F. Supp. 757, 760 (E.D. Pa. 1994) (citing *O'Leary v. Liberty Mut. Ins. Co.*, 923 F.2d 1062, 1066 (3d Cir. 1991); *see also* Restatement (Second) of Judgments § 27 cmt. e ("An issue is not actually litigated if the defendant might have interposed it as an affirmative defense but failed to do so . . . ."). "[T]he inquiry must always be as to the point or question actually litigated or

determined in the original action; not what might have been thus litigated and determined." *Zarnecki v. Shepegi*, 532 A.2d 873, 878 (Pa. Super. Ct. 1987) (emphasis removed) (citations omitted).

SGP did not raise its contingency defense in the Offit Action before the court entered the PSJ Order. *See* Statement Undisputed Facts, ECF No. 107-3 ¶ 66. Following the entry of the PSJ Order, SGP attempted to raise the contingency defense through two motions for reconsideration and in a related case it brought against Offit that was dismissed. The state court did not consider the contingency defense because it was raised too late—after partial summary judgment was entered. Accordingly, the issue was not properly raised or decided, and issue preclusion does not apply.

**B. Judicial Estoppel**

The Third Circuit applies federal judicial estoppel law in diversity cases. *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 261 (3d Cir. 2009) ("[W]e believe that a federal court's ability to protect itself from manipulation by litigants should not vary according to the law of the state in which the underlying dispute arose." (cleaned up)).[3] "The doctrine of judicial estoppel prevents a party from asserting inconsistent claims in different legal proceedings." *In re Mintze*, 434 F.3d 222, 232 (3d Cir. 2006). "Though there is no rigid test for judicial estoppel, three factors

[3] D'Annunzio relies on Pennsylvania law in support of his judicial estoppel arguments. Though there are differences, Pennsylvania law is not entirely inconsistent with federal law. It generally provides that "a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained." *In re Adoption of S.A.J.*, 838 A.2d 616, 620 (Pa. 2003) (citations omitted). "[T]he purpose of judicial estoppel is to uphold the integrity of the courts by preventing parties from abusing the judicial process by changing positions as the moment requires." *Id.* at 621 (cleaned up). The doctrine applies "where litigants play 'fast and loose' with the courts by switching legal positions to suit their own ends." *Id.* (quoting *Trowbridge v. Scranton Artificial Limb Co.*, 747 A.2d 862, 865 (Pa. 2000)). Courts ask two questions to determine whether judicial estoppel applies. First, they must determine whether the litigant assumed an "inconsistent" position with a judicial admission. *Id.* at 621. Even where the statements are plainly inconsistent, the court must determine whether the party "had the opportunity to proffer a sufficient explanation for the contradiction." *Id.* at 622. Second, courts consider whether the earlier position was "successfully maintained." *Id.* at 621.

inform a federal court's decision whether to apply it: there must be (1) irreconcilably inconsistent positions; (2) adopted in bad faith; and (3) a showing that estoppel addresses the harm and no lesser sanction is sufficient." *G-I Holdings*, 586 F.3d at 262 (cleaned up). Judicial estoppel "is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts." *In re Chambers Dev. Co.*, 148 F.3d 214, 229 (3d Cir. 1998).

D'Annunzio's motion fails with the first inquiry. SGP's positions are not irreconcilably inconsistent. The admissions to which D'Annunzio seeks to bind SGP include:

- SGP "will pay a fair price for services provided after an opportunity to review and audit all relevant invoices and supporting documentation that describe work performed by [Offit.]" Offit Action Ans. ¶ 66, ECF No. 107-5 at 41–42.
- Acknowledging "that [SGP] incurred debt to [Offit] for legal services but aver[ring] that it owes substantially less than the amount [Offit] demands." Offit Action Ans. ¶ 99, ECF No. 107-5 at 20, 44.
- SGP "believes some of the charges in the invoices are excessive and unwarranted. [SGP] wants to pay a fair price to [Offit] for services that are not the result of overbilling." Offit Action Ans. ¶ 103, ECF No. 107-5 at 44.
- In its interrogatory responses in the Offit Action, SGP stated that it "believe[d] it owe[d] about $350,000." ECF No. 107-5 at 139. SGP supplemented its response with calculations showing it owed Offit $385,277 based on authorized invoices and payments. ECF No. 107-5 at 145–46. SGP additionally provided a table of invoice charges showing the amount billed, how much of that was authorized and unauthorized, and any amount it maintained was excessive. ECF No. 107-5 at 149–155.

Although SGP admitted that certain invoice amounts were correct or authorized and expressed that it wanted to and would pay a fair price for the legal services provided, that does not amount to an admission that there was no agreement with Offit that SGP would pay when it obtained financing. SGP's admissions and the Offit Action judgments may foreclose a dispute as

to the amount owed, but it does not foreclose that there could have been an agreement that SGP would pay upon receipt of financing.

Furthermore, D'Annunzio has not asserted, let alone established, that SGP changed its position in bad faith or that judicial estoppel is necessary and tailored to address a harm D'Annunzio has suffered from SGP's change of position. *See G-I Holdings*, 586 F.3d at 261. For those reasons, judicial estoppel does not apply.

**C. The Merits of the Contingency Defense**

D'Annunzio additionally argues that the contingency defense should fail on the merits at this stage. He points to the absence of a contingency defense in the Offit Action, Letang's deposition testimony where he explained SGP would pay Offit with first dollars raised from financing, and that Letang did not recall D'Annunzio using the word "contingent" when coming to that solution. *See* ECF No. 107-1 at 16.

Letang and D'Annunzio had a meeting on March 17, 2017, where they discussed SGP's outstanding bills. *See* ECF No. 107-3 at 71 ¶ 73. That meeting took place at D'Annunzio's office and was attended only by D'Annunzio and Letang. ECF No. 107-21 at 10. It is undisputed that there is no documentation from that meeting pertaining to a contingency agreement, *see* ECF No. 107-21 at 10, and D'Annunzio denies ever reaching a contingency agreement with Letang, ECF No. 107-18 at 12. However, Letang testified that at the March 17 meeting, D'Annunzio provided a solution for SGP's billing issues. ECF No. 107-16 at 18. The solution was that "Offit would get for payment from first dollars raised through the capital-raising efforts on a go-forward basis." *Id.* SGP agreed that Offit "would receive first dollar of capital funds raised" "in exchange for Offit not demanding immediate payment." *Id.* Although Letang also testified that he could not recall D'Annunzio using the term "contingent" in their meeting, ECF No. 107-16 at 18, he testified

repeatedly that there was a contingency agreement and provided the details of that agreement, *e.g.*, ECF No. 107-21 at 10, 13.

The parties' competing stories ultimately require credibility determinations with respect to what occurred at the March 2017 meeting or in other communications that the Court cannot make at summary judgment. D'Annunzio's motion for partial summary judgment must, therefore, be denied.

## VI. D'Annunzio's Motion to Supplement the Record

After final judgment was entered against SGP in the Offit Action, D'Annunzio moved for leave to supplement the record as to the effect of that judgment. ECF No. 118. In opposition to D'Annunzio's motion for partial summary judgment here, the parties disputed whether the PSJ Order was sufficiently final to support issue preclusion. While the judgment in the Offit Action would support D'Annunzio's argument as to finality, the Court did not and need not reach that issue. As discussed above, issue preclusion applies only where an issue has been actually litigated. The contingency defense was at no time litigated in the Offit Action. Thus, the finality of the judgment has no bearing on the outcome here, and D'Annunzio's motion to supplement the record is denied.

## VII. Conclusion

For the foregoing reasons, summary judgment is granted in SGP's favor on the breach of contract and promissory estoppel claims, summary judgment is denied with respect to the unjust enrichment claim, and partial summary judgment is denied with respect to SGP's contingency defense. D'Annunzio's motion to strike and motion to supplement the record are also denied.

An appropriate Order follows.